1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 LUPE VARGAS, et al.,                    Case No. 16-cv-06634-WHO

8                 Plaintiffs,

9         v.                             **ORDER RE MOTIONS TO DISMISS
                                         AND STRIKE**
10 BERKELEY UNIFIED SCHOOL                Dkt. Nos. 29, 31, 32, 57
   DISTRICT, et al.,
11                Defendants.

12                                  **INTRODUCTION**

13        Plaintiffs, current and former students of Yvette Felarca and their parents, bring a

14 sprawling suit against the Berkeley Unified School District ("BUSD"), eleven of its teachers,

15 administrators and board members, and its outside counsel, Marleen Sacks, for violating a host of

16 state and federal claims because of the manner in which defendants investigated potential

17 misconduct by Felarca. The defendants are immune from suit on all of the state law claims. Some

18 of the federal claims are deficient. The parents of plaintiffs have not stated any plausible claims.

19 For the reasons discussed below, I GRANT defendants' Anti-SLAPP motions and GRANT IN

20 PART and DENY IN PART defendants' motions to dismiss.

21                                  **BACKGROUND**[1]

22        This case arises out of an investigation into the potential misconduct of Yvette Felarca, a

23 teacher at King Middle School in Berkeley who teaches both English Language Development

24

25 _____

26 [1] This background is based on the allegations in the complaint, which the court must take as true
   for the purposes of a motion to dismiss. The background also includes some information from
27 public news sources reporting on BAMN's and Felarca's public political activity and speech. This
   information, which consists largely of Felarca's public comments, is judicially noticeable as it is
28 not subject to reasonable dispute and can be accurately and readily determined from sources
   whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(2).

United States District Court
Northern District of California

("ELD") and History.  On June 26, 2016, in her free time, Felarca participated in a violent, and widely publicized, political protest in Sacramento with members of the group By Any Means Necessary ("BAMN") intended to "shut-down" a separate protest held by a neo-Nazi group. Complaint ("Compl.")  ¶ 42 (Dkt. No. 1); *see* RJN Ex. 5 (Dkt. No. 31-6) (CNN article "At least 10 injured – some stabbed – at California rally, authorities say").  Video of the Sacramento protest shows Felarca shouting at and attacking a neo-Nazi protestor.  *See* RJN Ex. 9 (Fox News Interview with Yvette Felarca by Tucker Carlson, published February 13, 2017) (Dkt. No. 31-10). Felarca has publicly defended the use of violent means to "shut down" fascism and has emphasized BAMN's commitment to organizing "militant protests that are mass and militant." *Id.*; s*ee* RJN Ex. 7 (KTVU interview of Yvette Felarca published February 3, 2017) (Dkt. No. 31-8).

Following the Sacramento protest, the Berkeley School District started receiving threats and calls from members of the public calling for Felarca's dismissal, apparently as a result of her controversial political and protest activity.  RJN Ex. 2 (Berkeleyside.com article) (Dkt. No. 31-3). Allegedly in response, on June 29, 2016, two BUSD officials, Superintendent Evans and Board of Education President Leyva-Cutler, issued a public statement indicating that they were looking into pursuing disciplinary action against Felarca.  Compl.  ¶ 48.  On June 30, 2016, Evelyn Tamondong-Bradley, the BUSD Director of Personnel Services, sent Felarca a notice of unprofessional conduct pursuant to Education Code section 44938, including 29 pages of details regarding Felarca's past unsatisfactory or unprofessional conduct.  RJN Ex.1 (Dkt. No. 31-2).  The notice did not include any reference to Felarca's protest activity in Sacramento.  *Id.*

On September 21, 2016, Marleen Sacks, an attorney for the school district, began conducting interviews of some of Felarca's current and former students about her conduct in and out of the classroom.  *Id.* ¶ 56.  These students were pulled from class.  At the beginning of these interviews, they were told that they could not tell their friends, teachers, or anyone else about the interviews.  *Id.* ¶ 47.  One of these students was plaintiff J.B., a non-native English speaker and an immigrant student from Peru, who reports that he was asked whether Felarca discussed immigrant rights and slavery in class and to report in detail "all political protests he had participated in, when

1  they occurred, where they occurred, and what the messages of the protests were." *Id.* ¶ 48.  He

2  alleges that he left the interview confused, conflicted, afraid, and worried that he would get in

3  trouble. *Id.* ¶ 50.  Plaintiff B.L., an immigrant student from the Ivory Coast, was also pulled from

4  class for an interview but, after reporting to the principal's office and waiting, was sent back to

5  class by Sacks, who told him she would interview him later. *Id.* ¶ 52.  B.L. alleges that he was

6  confused and felt like he was in trouble. *Id.* ¶ 52.

7       Felarca was placed on paid administrative leave later that day and remained on leave for

8  the next six weeks. *Id.* ¶ 55.  B.L.'s father, plaintiff Leviton, complained about the student

9  interviews at a School Board meeting that evening. *Id.* ¶ 53.  At some later point in time the

10  District contacted Leviton and "told him that any political protests that B.L. participated in were

11  not sanctioned by the District." *Id.* ¶ 54.

12       Over the course of the next several weeks, Sacks and school officials interviewed, or

13  indicated they intended to interview, many of Felarca's current and former students. *Id.*  ¶ 56.

14  These interviews were disproportionately conducted with Felarca's ELD students, who are largely

15  immigrant students and non-native English speakers. *Id.* ¶¶ 48, 60, 70.

16       On October 5, 2016, two Berkeley High School students, plaintiffs Vargas and X.M.,

17  former ELD students of Felarca's and of Mexican heritage, spoke out in her defense at a public

18  Board of Education meeting. *Id.* ¶ 58.  On October 11, 2016, both of these students, and a third

19  Latina student with whom they had once attended a protest, were individually pulled from class

20  and interviewed by Berkeley High Vice President Fierro and Assistant Superintendent of Human

21  Resources Van Thillo regarding Felarca's and their own protest activity. *Id.* ¶ 60.  In addition to

22  detailed questions about whether they had attended protests with Felarca and the nature of those

23  protests, they were asked sensitive questions regarding whether they were born in the United

24  States, their, or their family-members' immigration status, and their English ability. *Id.* ¶¶ 60, 63-

25  64, 70-71.  Vargas and X.M. allege that they were informed not to tell anyone about these

26  interviews, and were left feeling confused, worried, and as though they would get in trouble for

27  speaking out in favor of immigrant rights in the future. *Id.* ¶ 65-67.

28       Vargas reports that she was so upset following her interview that she told a friendly staff

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    member about it.  *Id.* ¶ 75.  When the pair returned to Fierro to complain about the interview,

2    Fierro spoke to the staff member outside of Vargas's presence, told Vargas that Fierro would have

3    to report her to Van Thillo because she had told someone about the interview, and stated that she

4    would possibly need to interview Vargas's brother.  *Id.* ¶ 75.  Plaintiffs allege that the schools

5    either did not obtain any of the students' parents' consent to interview their children or obtained

6    consent under false pretenses.  ¶¶ 52, 69.

7         This lawsuit followed.[2]  The students allege that they were singled out for interviews on

8    the basis of their national origin and race and in retaliation for exercising their First Amendment

9    rights.  They further allege that school administrators used intimidating tactics and veiled threats

10   to discourage them and their families from exercising their First Amendment rights in the future

11   and speaking out in favor of immigrant rights and against racism.  Their parents allege that they

12   were deprived of their right to participate in the education of their children because school

13   officials did not obtain their consent before conducting interviews of their children.  Plaintiffs

14   bring claims for: (1) racial and national origin discrimination, hostile educational environment,

15   and retaliation under the Fourteenth Amendment and Article I, Section 31 of the California

16   Constitution; (2) racial and national origin discrimination, hostile educational environment, and

17   retaliation under Title VI of the Civil Rights Act and California Education Code § 220; (3)

18   violation of freedom of speech under the First Amendment and Article I, Section 2 of the

19   California Constitution; (4) deprivation of parents' and guardians' right to participate in the

20   education of their children under California Education Code §§ 51100; (5) violation of the Bane

21   Act, Cal. Civil Code § 52.1(b); and (6) intentional infliction of emotional distress.  They assert

22   these claims against BUSD, Superintendent Donald Evans, Assistant Superintendent of Human

23   Resources Lisa Van Thillo, Board of Education President Beatriz Leyva-Cutler, Board Directors

24   Ty Alper, Judy Appel, Josh Daniels, and Karen Hemphill, Director of BUSD Personnel Services

25   Evelyn Tamondong-Bradley, King Middle School Principal Janet Levenson, Berkeley High

26

27   [2] Felarca also filed a lawsuit in this district against many of the same defendants, alleging that the
     investigation and disciplinary action taken against her violated her constitutional rights and were
28   unlawful.  *See Felarca v. Berkeley Unified School District*, No. 16-cv-06184-RS.  She has now
     voluntarily dismissed that case.

1    School Principal Sam Pasarow, Berkeley High School Vice Principal Shannon Fierro, and

2    BUSD's outside counsel, Marleen Sacks.[3]  All claims are asserted against all defendants except

3    claim (2), which is brought only against BUSD.  The claims are brought against the individual

4    defendants in their individual and official capacities, with the exception of Sacks (who is sued

5    only in her individual capacity).  Plaintiffs seek only damages.

6                                    **LEGAL STANDARD**

7    **ANTI-SLAPP MOTION TO STRIKE**

8            California Code of Civil Procedure § 425.16, also known as California's "anti-SLAPP"

9    statute, was enacted to address "a disturbing increase in lawsuits brought primarily to chill the

10   valid exercise of the constitutional rights of freedom of speech and petition for the redress of

11   grievances."  Cal. C.C.P. § 425.16(a).  It is designed "to allow early dismissal of meritless first

12   amendment cases aimed at chilling expression through costly, time-consuming litigation."

13   *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  Under § 425.16, a defendant

14   may bring a motion to strike any "cause of action against a person arising from any act of that

15   person in furtherance of the person's right of petition or free speech under the United States

16   Constitution or the California Constitution in connection with a public issue."  Cal. C.C.P. §

17   425.16(b)(1).  Such claims are subject to striking "unless the court determines that the plaintiff has

18   established that there is a probability that the plaintiff will prevail on the claim."  *Id.*  The anti-

19   SLAPP statute does not apply to federal causes of action brought in federal court, but an anti-

20   SLAPP motion to strike may be brought in federal court to strike California constitutional,

21   statutory, and common law claims.  *Riese v. Cnty. of Del Norte*, No. 12-cv-03723-WHO, 2013

22   WL 4732603, at *3 (N.D. Cal. Sept. 3, 2013); *Vess et al. v. Ciba-Geigy Corp. et al.*, 317 F.3d

23   1097, 1109 (9th Cir. 2003).

24           In assessing a motion to strike under § 425.16, a court engages in a two step-process.

25   *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002).  At the first step, the defendant must make a

26   "threshold showing that the challenged cause of action is one arising from protected activity, that

27

28   _____
     [3] All of the defendants excepts Sacks are sometimes referred to herein as "the BUSD defendants."

United States District Court
Northern District of California

is, by demonstrating that the facts underlying the plaintiff's complaint fits one of the categories spelled out in Section 425.16, subdivision (e)."  *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 465 (2012).  These categories are as follows:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law,
>
> (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law,
>
> (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or
>
> (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Cal. C.C.P. § 425.16(e).

To determine whether a cause of action arises out of one of these protected activities the court must look at "what activities form the basis for each of Plaintiffs' causes of action."  *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014).  "[I]f the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion."  *Scott v. Metabolife Intern., Inc.*, 115 Cal. App. 4th 404, 414 (2004).

If the defendants can establish that the claims against them arise out of protected activity, the court moves on to the second step where it assesses whether the plaintiffs have demonstrated a probability of prevailing on their claims.  *Navellier*, 29 Cal. 4th at 88.  Assessing whether plaintiffs have demonstrated a probability of prevailing on their claims is similar to a "motion for summary judgment in reverse."  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1123 (1999).  "A nonmovant [under § 425.16] satisfies this burden by showing that the claim is legally sufficient and supported by a prima facie showing of facts sufficient for a judgment in the nonmovant's favor if the evidence relied on is credited."  *Id.*

United States District Court
Northern District of California

6

1    **MOTION TO DISMISS**

2           Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

3    if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

4    dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

5    face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

6    the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

7    is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

8    omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

9    While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts

10   sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

11          In deciding whether a plaintiff has stated a claim upon which relief can be granted, the

12   Court accepts plaintiff's allegations as true and draws all reasonable inferences in favor of the

13   plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is

14   not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

15   fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir.

16   2008).

17          If the court dismisses the complaint, it "should grant leave to amend even if no request to

18   amend the pleading was made, unless it determines that the pleading could not possibly be cured

19   by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

20   this determination, the court should consider factors such as "the presence or absence of undue

21   delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

22   undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

23   *Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

                                   **DISCUSSION**

24

25   I.    **MOTION TO STRIKE**

26          The defendants move to strike all of plaintiffs' state law claims.

27          A.      **Whether Plaintiffs' Claims Arise From Protected Activity**

28          The defendants assert that plaintiffs' state law claims arise out of protected activity

United States District Court
Northern District of California

1    because they all relate to the student interviews, which were completed as part of an investigation

2    into Felarca's potential misconduct.  Defendants assert that these interviews fall under the first and

3    second categories of § 425.16(e) because they were "written or oral statement[s] or writing[s]

4    made before" or "in connection with an . . . official proceeding authorized by law."  Cal. C.C.P. §

5    425.16.  Plaintiffs do not dispute this assertion, instead arguing that this is not an anti-SLAPP case

6    because the interviews were not a "valid" exercise of the defendants' allegedly protected activity.

7                    1.    **The School Disciplinary Proceedings are "Official Proceedings"**

8           The procedures for disciplining public school teachers, and for suspending or dismissing

9    them, are exhaustively outlined in the California Education Code.  Section 44932 of the code

10   outlines the grounds on which a school board may suspend or dismiss a tenured school teacher.

11   EDC § 44932.  However, schools may not act on any of these grounds without first providing

12   teachers with notice of unprofessional conduct and giving them at least 90 days to correct any

13   faults.  EDC § 44938.  If the issues are not resolved the school board may give the employee

14   notice of an intention to dismiss or suspend, at which point the employee may demand a full

15   hearing before an administrative law judge.  EDC § 44934.  A teacher may seek judicial review of

16   any final decision by the Board of Education regarding suspension or dismissal.  *See Bekiaris v.*

17   *Bd. of Education*, 6 Cal.3d 575, 586 ("Judicial review of a determination of the board may be

18   obtained through the filing of a petition for mandate pursuant to the provisions of the Code of

19   Civil Procedure (Gov. Code § 11523.)").

20          The disciplinary procedures for teachers share many important similarities with the

21   hospital peer review procedures discussed in *Kibler v. Inyo Cnty. Local Hospital District*, 39

22   Cal.4th 192 (2006).  In *Kibler*, the California Supreme Court analyzed whether a private hospital's

23   peer review process qualified as an "official proceeding" under § 425.16.  *Id.* at 199.  It concluded

24   that hospital peer review was an "official proceeding" for three primary reasons; (1) the process

25   was required by the California Business and Professions Code Section 805; (2) the process "plays

26   a significant role in protecting the public against incompetent, impaired, or negligent physicians"

27   because disciplinary action taken against physicians may lead to restrictions on the license to

28   practice; and (3) peer review procedures are "subject to judicial review by administrative

United States District Court
Northern District of California

1    mandate." *Id.* at 199-200.

2            As in *Kibler*, key portions of BUSD's disciplinary procedures are required by statute.  The

3    school's disciplinary procedures play an important public role, protecting the public and public

4    school children from unfit teachers.  Any dismissal or suspension procedures initiated against a

5    public school teacher are subject to a hearing before an administrative law judge and any final

6    decision is subject to judicial review.  Under the California Supreme Court's analysis in *Kibler,*

7    the school district's disciplinary proceedings are "official proceedings" authorized by law.

                     2.      **Statements and Communications Related to the Student Interviews are**
8                            **Protected Activity**

9            On June 30, 2016, BUSD gave Felarca a notice of unprofessional conduct, informed her

10   that her conduct was "grounds for dismissal under Education Code section 44932" and warned her

11   that "failure to correct [her] deficiencies in [her] unprofessional conduct and unsatisfactory

12   performance will result in disciplinary action, up to and including dismissal."  RJN Ex. 1.

13   Following this notice, the defendants began investigating additional allegations of misconduct by

14   Felarca and interviewed a number of students to determine if she was placing students in danger

15   by taking them to protests or misusing class time by promoting her political beliefs.  On

16   November 1, 2016, BUSD issued Felarca a second notice of unprofessional conduct that included

17   new details based largely on statements given by students in these interviews.  The November 1st

18   letter also indicated that failure to correct her behavior would "result in disciplinary action, up to

19   and including dismissal."

20           Defendants' statements and communications related to the investigation into Felarca were

21   protected activity.  Defendants conducted student interviews to develop facts regarding Felarca's

22   alleged misconduct and to initiate disciplinary proceedings.  Following the interviews they issued

23   a notice of unprofessional conduct including specific facts and information obtained through the

24   interviews.  "Communications preparatory to or in anticipation of the bringing of an official

25   proceeding are within the protection of section 425.16."  *Hansen v. California Dept. of*

26   *Corrections & Rehabilitation*, 171 Cal. App. 4th 1537, 1544 (Cal. Ct. App. 2008).  This may

27   include communications or statements made during an internal investigation.  *Id.* (holding that

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  statements and writings made by personnel during an internal investigation conducted for the

2  purposes of securing a search warrant were protected under § 425.16).  The student interviews in

3  this case were preparatory to BUSD filing an official notice of unprofessional conduct regarding

4  Felarca taking students to protests.  This notice was a necessary preliminary step in the process of

5  initiating formal suspension or dismissal proceedings against Felarca and is a writing or statement

6  made as part of an "official proceeding."  *See* EDC § 44938.

7      Plaintiffs assert that the student interviews were not protected activity because they chilled

8  the plaintiffs' First Amendment activities.  MTS Oppo. at 4-5 (Dkt. No. 37).  Although speech that

9  is "illegal as a matter of law" is not protected under the anti-SLAPP statute, *Flatley v. Mauro*, 39

10  Cal.4th 299, 320 (2006), plaintiffs must show by "concession or by uncontroverted and conclusive

11  evidence" that the defendants' statements were illegal.  *Id.*  Plaintiffs have not met this burden.

12  The statements made to students during the interviews, conducted as part of the investigation,

13  were statements made in connection with, or to initiate, an official proceeding and are not subject

14  to the illegal activity exception.

15              3.      **Plaintiffs' Claims Arise Out of Protected Activity**

16      Plaintiffs' claims are rooted in the defendants' statements made during the student

17  interviews conducted as part of the investigation into Felarca.  Plaintiffs allege that these

18  statements were discriminatory, chilled their First Amendment rights, and caused them emotional

19  distress.  The parent plaintiffs also assert derivative claims based on the interviews of their

20  children.  The claims, at their core, arise out of the defendants' statements in these interviews.

21      Plaintiffs assert that the claims do not arise out of protected activity because the interviews

22  were not genuinely tied to the investigation into Felarca.  MTS Oppo. at 5.  They assert that the

23  interviews were irrelevant to the investigation because "the truth of the 'allegations' against

24  Felarca were ascertainable through the normal processes of observing her class, reviewing her

25  class materials, talking to her peers, and talking to students' parents."  *Id.* at 5-6.  This assertion is

26  contradicted by the November 1, 2016 notice of unprofessional conduct.  *See* RJN Ex. 1.  Most of

27  the allegations against Felarca outlined in the November 1st notice relate to conduct outside the

28  classroom, such as taking students to protests and other BAMN-supported events.  RJN Ex. 1.

10

These are the precise issues the defendants discussed with students in their interviews.  *See e.g.* Vargas Decl. ¶ 12-16 (Dkt. No. 37-1).  The school could not possibly learn the full details of these events, and whether students and their parents were aware of potential dangers associated with these events, by observing Felarca's classroom conduct; the events took place outside the classroom.  To the extent plaintiffs argue that out-of-classroom conduct cannot form the grounds for discipline or dismissal of a teacher, this position is not supported by the Education Code.  *See* EDC § 44932.  The student interviews were directly tied to the investigation into Felarca's potential misconduct and to the allegations included in the November 1st notice of unprofessional conduct.

Plaintiffs' also argue that the anti-SLAPP statute does not apply where the "protected activity" harms individuals "who are not parties to the protected activity."  They cite two cases in support of this claim.  Neither is on point.

First they rely on *Coretronic Corp. v. Cozen O'Connor*, 192 Cal. App. 4th 1381 (2011), a case arising out of a law firm's conflict of interest.  In *Coretronic*, plaintiffs had provided confidential information to the attorneys of their liability insurance provider in connection with a demand for coverage and defense in an underlying action.  *Id.* at 1384-85.  The same firm then undertook representation of the opposing party in the underlying litigation in a separate action.  *Id.* at 1385.  Coretronic then sued the attorneys for failing to disclose the conflict and for obtaining confidential information through misrepresentation.  *Id.*  The California Court of Appeal rejected the attorneys' motion to strike the claims under the anti-SLAPP statute, holding that the claims arose out of the attorneys' dual representation and misrepresentation, not their advocacy work in the underlying cases.  *Id.* at 1392-93.  This case is inapposite; the claims in *Coretronic* were not subject to the anti-SLAPP statute because they did not arise out of the protected activity, not because they were asserted by someone who was "not a party to the protected activity."

Plaintiffs also cite *Hart v. Larson*, No. 16-cv-01460-BEN, 2017 WL 532290 at *4 (S.D. Cal. Feb. 7, 2017), in which a plaintiff's attorney alleged that another attorney had misrepresented certain settlement offers in a pending case in order to induce him to agree to a particular fee-sharing scheme.  The court concluded that these claims did not arise out of any protected activity,

11

even though they were tangentially related to settlement communications, because they were rooted in the defendant's "material misrepresentations that induced [plaintiff] into entering a fee-splitting agreement." *Id.* at *5. Like *Coretronic*, *Hart* centers on whether the claims arise out of protected activity, not whether the plaintiffs were "parties to the protected activity."

Unlike in *Coretronic* and *Hart*, plaintiffs' claims here are directly tied to the defendants' protected activities. They arise out of the defendants' statements and communications made in interviews conducted as part of an official investigation. The defendants asked students questions in an attempt to gather information relevant to Felarca's potential misconduct. While the plaintiffs now assert that those questions were discriminatory and chilled their First Amendment speech, the defendants have demonstrated that the claims against them arise from their protected activity. That satisfies the first step of the anti-SLAPP analysis.

### B. Whether Plaintiffs Have a Probability of Prevailing on their Claims

Once defendants demonstrate that the claims against them arise out of protected activity, the plaintiffs must show that there is a probability of prevailing on their claims. *Briggs*, 19 Cal. 4th at 1123. "A nonmovant [under § 425.16] satisfies this burden by showing that the claim is legally sufficient and supported by a prima facie showing of facts sufficient for a judgment in the nonmovant's favor if the evidence relied on is credited." *Id.* Plaintiffs cannot make this showing because the defendants are immune from suit on the state law claims.

#### 1. BUSD Immunity

The BUSD defendants are all immune on the state law claims under the California Tort Claims Act, which shields public employees from suit for any injury caused by instituting or prosecuting a judicial or administrative proceeding within the scope of their employment. *See* Cal. Gov. Code § 810 *et seq.* This section states that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." *Id.* § 821.6. California courts have applied the immunity to disciplinary investigations similar to the one described in the parties' briefing and alleged in the complaint. *See Kemmerer v. Cnty. of Fresno*, 200 Cal.App.3d 1426, 1436-37 (1988) (public employees were absolutely immune from suit for

conduct related to an internal investigation into the misconduct of a civil service employee).  The purpose of this immunity is to ensure that public entities are "able to investigate wrongdoing without fear of reprisal through civil litigation."  *Geiche v. City & Cnty. of San Francisco*, No. 08-cv-3233-JL, 2009 WL 1948830, at *5 (N.D. Cal. Jul. 2, 2009).  "If every public entity employee who was found to have committed an act of misconduct and later disciplined were allowed to bring a tort suit against his coworkers and superiors, this would certainly bode ill for the continuing efficiency and morale of the civil service system."  *Kemmerer*, 200 Cal.App.3d at 1439.  Although this immunity is generally used to prevent the subject of an investigation from bringing a later tort claim, the same policy rationales justify preventing witnesses, friendly to the subject of investigation, from bringing tort claims on their own behalf.  Because plaintiffs' claims against the BUSD defendants arise out of their conduct in the course of investigating possible misconduct by Felarca and potential disciplinary action, § 821.6 applies and the BUSD defendants are absolutely immune from suit.

### 2.   Sacks's Immunity

Sacks is immune from suit on plaintiffs' state law claims under California's litigation privilege.  The litigation privilege protects any "publication or broadcast . . . in any (1) legislative proceedings, (2) judicial proceedings, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandate]."  Cal. Civ. Code § 47(b).  "The litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings.  The privilege extends beyond mere statements made in proceedings, and includes statements made to initiate official action."  *Kashian v. Harriman*, 98 Cal. App. 4th 892, 913 (2002).  "The privilege has been broadly applied to demand letters and other prelitigation communications by attorneys." *Blanchard v. DIRECTV, Inc.*, 123 Cal.App.4th 903, 919 (Ct. App. 2004).  "[A] prelitigation statement is protected by the litigation privilege of section 47, subdivision (b) when the statement is made in connection with a proposed litigation that is contemplated in good faith and under serious consideration."  *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 262 (Ct. App. 1997).

Sacks asserts that the litigation privilege applies because all of plaintiffs' claims arise out

1    of her statements and communications made in connection with the official investigation into

2    Felarca's misconduct and the disciplinary proceedings.  For the same reasons that the anti-SLAPP

3    statute applies to these claims, the litigation privilege applies to Sacks' statements to the students

4    during the student interviews.  These statements were made as part of an ongoing investigation

5    and were connected to an official proceeding.  They were directly related to the disciplinary action

6    against Felarca as Sacks sought to obtain information and details regarding Felarca's conduct.

7    These statements directly furthered the proceedings as information obtained from the student

8    interviews was included in the subsequent notice of unprofessional conduct sent to Felarca on

9    November 1, 2016.

10        Plaintiffs assert that § 47 should not apply to these claims because the plaintiffs were not

11   the subjects of the investigation and applying § 47 would not further the purposes of the privilege.

12   MTS Oppo. at 24.  Not so.  "The purposes of section 47, subdivision (b), are to afford litigants and

13   witnesses free access to the courts without fear of being harassed subsequently by derivative tort

14   actions, to encourage open channels of communication and zealous advocacy, to promote

15   complete and truthful testimony, to give finality to judgments, and to avoid unending litigation."

16   *Silberg v. Anderson*, 50 Cal.3d 205, 213-14 (1990).  Applying the privilege to Sacks' interviews

17   with the students in this case falls within the rule's purposes of affording litigants free access to

18   the courts without fear of being harassed subsequently, of encouraging zealous advocacy, and of

19   promoting complete and truthful testimony.  It furthers these goals by encouraging the attorney to

20   ask any and all questions she believes are relevant to pursuing the claims without fear of

21   subsequent tort action.  The litigation privilege bars plaintiffs' state law claims against Sacks.

22        C.    **Motion to Strike Analysis**

23        The defendants have demonstrated that plaintiffs' state law claims arise out of the

24   defendants' protected activity and plaintiffs have failed to demonstrate a probability of prevailing

25   on these claims.  This entitles defendants to prevail on their motion to strike all the state law

26   claims.  However, the procedural structure of anti-SLAPP, permitting immediate dismissal, with

27   prejudice, and an award of attorneys' fees for a prevailing defendant, is at odds with Rule 15 of the

28   Federal Rules of Civil Procedure.  *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d

United States District Court
Northern District of California

14

1081, 1091 (9th Cir. 2004). "[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Id.* The Ninth Circuit has indicated that the key to resolving this tension is providing the plaintiff with some means to amend. *See Covad Communications*, 377 F.3d at 1091 (district court did not err by deferring ruling on motion to strike until after plaintiffs had opportunity to file first amended complaint); *Greensprings Baptist Christian Fellowship Trust v. Cilley*, 629 F.3d 1064, 1066 n.1 (2010) (noting in dicta that a district court's decision to grant a motion to strike with leave to amend was in line with the Ninth Circuit's decision in *Covad Communications*). These cases indicate that a district court may properly grant a motion to strike or defer ruling on a motion strike as long as it provides the plaintiff with some opportunity to amend in compliance with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment. I therefore GRANT defendants' motion to strike the California claims and give plaintiffs leave to amend within twenty days.

## II.   MOTIONS TO DISMISS

### A.   Immunity Defenses

The BUSD defendants and Sacks have moved to dismiss all of plaintiffs' claims. They each make a number of general pleading or immunity arguments that apply to multiple claims. As discussed above, I conclude that the BUSD defendants and Sacks are absolutely immune from suit on the state law claims (Count One and Count Three to the extent they are asserted under the California Constitution, and Counts Four, Five, and Six), under the California Tort Claims Act and the litigation privilege. As discussed below, BUSD is also immune from suit on the § 1983 claims (Count One and Count Three) under the Eleventh Amendment, but not on the Title VI claim (Count Two). The individual BUSD defendants and Sacks are not immune on the § 1983 claims (Count One and Count Three) and they are not sued on the Title VI claim (Count Two).

#### 1.   Eleventh Amendment

Under controlling Ninth Circuit precedent, California school districts have Eleventh Amendment immunity and cannot be sued for damages under § 1983. *See Belanger v. Madera Unified School Dist.*, 963 F.2d 248, 251 (9th Cir. 1992) ("[Under California law, the school

district is a state agency that performs central governmental functions.  Thus, the school district is protected by the Eleventh Amendment."); *C.W. v. Capistrano Unified School Dist.*, 784 F.3d 1237, 1247 (9th Cir. 2015) ("It is well-established that a school district cannot be sued for damages under § 1983").  The Eleventh Amendment also protects BUSD employees from suit to the extent they are sued in their official, but not individual, capacities.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997); *Hafer v. Melo*, 502 U.S. 21, 31 (1991).  As plaintiffs seek only damages and no form of injunctive relief on their civil rights claims, these claims are barred against BUSD and the individual BUSD defendants sued in their official but not individual capacity.

### 2.  **Other BUSD Immunities**

As discussed above with regard to the motion to strike, the California Tort Claims Act provides the BUSD defendants with absolute immunity on all the state law claims.  The individual BUSD defendants assert that this immunity also protects them from suit on the § 1983 claims.  They are incorrect.  The Supreme Court has made clear that state immunity laws of this kind cannot shield individuals from constitutional liability under § 1983.  *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 [] cannot be immunized by state law.").  The California Tort Claims Act does not immunize the individual BUSD defendants on the § 1983 claims.

The individual BUSD defendants alternatively argue that they are immune from damage suits under § 1983 on the basis of prosecutorial immunity.  They note that individuals performing quasi-prosecutorial functions in connection with administrative proceedings are entitled to the same absolute immunity as formal prosecutors in criminal cases.  *See Meyers v. Contra Costa Cnty. Dep't of Soc. Serv.*, 812 F.2d 1154, 1157 (9th Cir. 1987) (state social workers were immune from suit regarding their involvement in "quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings").  While true, even formal prosecutors are not entitled to absolute immunity when they engage in investigative, rather than prosecutorial duties.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the

one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.").  "When a prosecutor performs the investigative functions normally performed by a detective or police officer" prosecutorial immunity does not apply.  *Id.*

The individual BUSD defendants have failed to show that they performed a quasi-prosecutorial function by conducting the student interviews.  These interviews were investigative rather than prosecutorial as the defendants were gathering information that might prove relevant to disciplinary proceedings against Felarca.  They were not evaluating existing evidence or preparing witnesses for trial or testimony.  In conducting the interviews, they were not exercising quasi-prosecutorial judgment or acting as advocates.  Because the individual BUSD defendants were not engaged in quasi-prosecutorial conduct while interviewing the students, the absolute immunity does not apply.

The BUSD defendants are absolutely immune from suit on plaintiffs' state law claims (Count One and Count Three to the extent they are asserted under the California Constitution, and Counts Four, Five, and Six).  These Count are DISMISSED with regard to all the BUSD defendants.  Further, the Eleventh Amendment bars plaintiffs' § 1983 claims against BUSD.  Plaintiffs' § 1983 claims (Count One and Count Three) are DISMISSED with regard to BUSD.

### 3.   **Sacks's Immunity Arguments**

As discussed with regard to the motion to strike, the California litigation privilege provides Sacks with absolute immunity on all of plaintiffs' state law claims.  As with the California Tort Claims Act, this immunity cannot protect her from § 1983 liability.  *See Martinez*, 444 U.S. at 284 n.8.

Sacks does not argue that she is immune from suit on the § 1983 claims but asserts that plaintiffs have failed to state a § 1983 claim against her because they have not alleged facts indicating that she was acting under color of law.  She alleges that generally lawyers in private practice are not state actors and that plaintiffs' allegations that she participated in the Felarca investigation as BUSD's outside counsel are therefore insufficient.  *See Simmons v. Sacramento Cnty. Superior Court*, 318 F.3d 1156, 1161 (2003) ("Plaintiff cannot sue Mirante's counsel under

17

United States District Court
Northern District of California

1   § 1983, because he is a lawyer in private practice who was not acting under color of state law.").

2       This argument is not persuasive.  While the Ninth Circuit has held that private attorneys do

3   not become state actors by representing parties in court proceedings, it has also made clear that

4   private attorneys hired by a state agency to represent the state in litigation or to assist in

5   conducting an investigation act under color of law.  *See Gonzalez v. Spencer*, 336 F.3d 832 (9th

6   Cir. 2003) ("Spencer acted under color of state law.  She was retained to represent state entities

7   and their employees in litigation.  She inspected Gonzalez's file in the course of that

8   representation, and used her status to gain access to the file.").  Similarly, the Supreme Court has

9   held that private counsel hired to assist a government entity in carrying out an official

10  investigation is engaged in the "performance of government duties" and is therefore entitled to

11  qualified immunity.  *See Filarsky v Delia*, 566 U.S. 377, 393-394 ("Though not a public

12  employee, Filarsky was retained by the City to assist in conducting an official investigation into

13  potential wrongdoing.  There is no dispute that government employees performing such work are

14  entitled to seek the protection of qualified immunity.").  Implicit in this holding is that such

15  attorneys act under color of state law; they would not be entitled to qualified immunity if they

16  were not state actors.  These cases demonstrate that a private attorney, hired by a state agency to

17  conduct an official investigation, acts under color of state law by carrying out that investigation.

18      Plaintiffs have alleged that Sacks was retained by BUSD to assist in carrying out an

19  investigation into Felarca's potential misconduct and that she conducted discriminatory interviews

20  in the course of that investigation.  They have alleged sufficient facts to demonstrate that Sacks

21  acted under color of state law.

22      Sacks is absolutely immune from suit on plaintiffs' state law claims (Count One and

23  Count Three to the extent they are asserted under the California Constitution, and Counts Four,

24  Five, and Six).  These claims are DISMISSED with regard to Sacks.

25      B.      **Sufficiency of the Claims**

26      BUSD is not immune from suit on plaintiffs' Title VI claim and the individuals defendants

27  are not immune on plaintiffs' § 1983 claims.  The defendants assert that these claims still must be

28  dismissed because plaintiffs have failed to plead sufficient facts to state these claims.

1

    1.    **Counts One & Three: Equal Protection Violation & Violation of Freedom of Speech Under § 1983**

2
        Plaintiffs bring claims for racial discrimination, hostile educational environment,

3
retaliation, and violation of freedom of speech, under U.S.C. § 1983 against all 13 defendants.

4
Although BUSD is immune from suit on these claims, the individual defendants are not.  Because

5
there is substantial overlap in the analysis of these claims, I will address them together.

6
        In general, to establish a claim for relief under § 1983 plaintiffs must allege "(1) a violation

7
of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by

8
conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418,

9
1420 (9th Cir. 1991).  The individual defendants assert that plaintiffs have failed to allege

10
sufficient facts to state a claim against all defendants except for Van Thillo and Fierro.  I conclude

11
that plaintiffs have failed to state § 1983 claims against Alper, Appel, Daniels, Hemphill, Leyva-

12
Cutler, Evans, Pasarow, Levenson, and Tamondong-Bradley, but have stated claims against Van

13
Thillo, Fierro, and Sacks.

14
        When plaintiffs "seek to hold an individual defendant personally liable for damages" under

15
§ 1983, they "must set forth specific facts as to each individual defendant's" conduct.  *Leer v.*

16
*Murphy*, 844 F.2d 628, 634 (1988).  "Sweeping conclusory allegations will not suffice."  *Id.*

17
"Liability under [§] 1983 arises only upon a showing of personal participation by the defendant.

18
A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor

19
participated in or directed the violations, or knew of the violations and failed to act to prevent

20
them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "The requisite causal connection can

21
be established . . . by setting in motion a series of acts by others, or knowingly refusing to

22
terminate a series of acts by others, which they knew or reasonably should have known would

23
cause others to inflict constitutional injury."  *Moss v. United States Secret Service*, 711 F.3d 941,

24
967 (9th Cir. 2013) *rev'd on other grounds*.  Conclusory allegations that supervisors directed their

25
subordinates' actions, without providing specificity as to which actions they directed or approved,

26
are insufficient.  *Id.* at 968.

27
        **a.**    **The Supervisors**

28
        Plaintiffs' allegations against the individual supervisor defendants are too vague and scant

United States District Court
Northern District of California

1    to state a § 1983 claim.[4]  They make the conclusory allegation that all of the defendants

2    negligently hired, supervised or trained each other as well as unnamed BUSD employees.  Lacking

3    any specific facts, this statement cannot support a constitutional claim on the basis of supervisor

4    liability.  *Leer*, 844 F.2d at 634.

5            Plaintiffs also allege that Leyva-Cutler and Evans issued a statement on June 29, 2016,

6    indicating an intent to address Felarca's possible misconduct, and that Board Directors Alper,

7    Appel, Daniels, Hemphill, Leyva-Cutler, and Evans "directed" others to conduct interviews.

8    These allegations are general and conclusory, and at most indicate that these individuals assented

9    to the investigation of Felarca at a high level.  They are not specific enough to show that these

10   individuals directed others to engage in discriminatory or chilling practices, or assented to the

11   particular means that were used in interviewing students.  *See Moss*, 711 F.3d at 968 (plaintiffs

12   failed to allege sufficient facts to establish supervisor culpability where they alleged only that

13   supervisors "directed and approved of the actions of the police" but did not specify which actions

14   they directed and "d[id] not allege that the supervisors directed or approved the tactics").

15           Plaintiffs also allege that student interviews took place under the authority of Berkeley

16   High Principal Pasarow and King Middle School Principal Levenson because they occurred on

17   their campuses.  These allegations rely entirely on Pasarow's and Levenson's supervisory

18   positions and fail to demonstrate that Pasarow or Levenson had any knowledge of or personal

19   involvement in the interviews.  Plaintiffs' allegations against Alper, Appel, Daniels, Hemphill,

20   Leyva-Cutler, Evans, Pasarow, and Levenson[5] are insufficient to state a § 1983 claim on the basis

21   of supervisor liability.

22                          **b.      The Direct Actors**

23           Plaintiffs allege with varying degrees of specificity that five of the defendants, Levenson,

24   Tamondong-Bradley, Van Thillo, Fierro, and Sacks, personally conducted discriminatory and

---

[4] In their opposition to BUSD's motion to dismiss, plaintiffs outline additional allegations regarding many of the BUSD defendants.  Oppo. to BUSD Mot. at 6-8 (Dkt. No. 39).  As these allegations are not included in the complaint, I do not consider them here.

[5] Plaintiffs also allege that Levenson personally conducted interviews.  I address whether these allegations are sufficient to state a claim against Levenson under the "Direct Actors" section *infra*.

United States District Court
Northern District of California

1   speech-chilling interviews of Felarca's ELD students.

2        First, they allege that from September 21, 2016 to November 2, 2016, Levenson,

3   Tamondong-Bradley, Van Thillo, Fierro, and Sacks conducted interviews of Felarca's current and

4   former ELD students at King Middle School and Berkeley High.  Compl. ¶¶ 56-57.  This is the

5   only specific allegation brought against Levenson and Tamondong-Bradley with regard to the

6   interviews.  Plaintiffs do not provide any further factual allegations regarding these two

7   defendants' participation in the allegedly discriminatory and speech-chilling interview process.

8   They do not name any students that either Levenson or Tamondong-Bradley allegedly spoke to

9   and do not provide the details of any interviews they may have conducted.  The bare allegations

10  that these two individuals conducted interviews of students, without more, is insufficient to state

11  any § 1983 claim against them.  *See Leer*, 844 F.2d at 634 (When plaintiffs "seek to hold an

12  individual defendant personally liable for damages" under § 1983 they "must set forth specific

13  facts as to each individual defendant's" conduct.  "Sweeping conclusory allegations will not

14  suffice.").

15       Plaintiffs allege more specific facts regarding interviews conducted by Sacks, Van Thillo,

16  and Fierro.  They allege that Sacks conducted an interview of plaintiff J.B., an immigrant student

17  from Peru, and asked him whether issues regarding immigrant rights and slavery were discussed in

18  Felarca's class.  *Id.* ¶ 48.  Sacks allegedly also asked J.B. to "relate in detail any and all political

19  protests he had participated in, when they occurred, where they occurred, and what the messages

20  of the protests were."  *Id.*  Plaintiffs allege that she conducted interviews of at least six other

21  students who were "nearly all, if not all, current and former ELD students of Ms. Felarca,"

22  meaning that they were largely immigrant students and non-native English speakers.  *Id.* ¶ 51.

23  They add that she had plaintiff B.L., an immigrant student from the Ivory Coast, pulled from class

24  for an interview, but later dismissed him, telling him she would interview him later.  *Id.* ¶ 52.

25       The most specific allegations are leveled against Van Thillo and Fierro.  Plaintiffs allege

26  that Van Thillo and Fierro interviewed plaintiffs Vargas and X.M., both of whom are of Mexican

27  heritage, on October 11, 2016 and asked them questions about whether they had attended protests,

28  the nature of those protests, how Felarca conducted herself in the classroom with her students, and

United States District Court
Northern District of California

21

what topics Felarca had focused on in class.  *Id.*  ¶¶ 62-64, 70-72.  They state that these interviews took place just a few days after Vargas and X.M. spoke during the public comment period of a Board of Education meeting and demanded that Felarca be taken off of administrative leave.  *Id.* ¶ 58.  They assert that Van Thillo and Fierro asked Vargas and X.M. sensitive questions about whether they and their family members are immigrants, where they live, and whether they have legal status.  *Id.* ¶¶ 64, 73.

The students were also told not to speak to other students or teachers about the interviews, and when Vargas informed a staff member about her interview and explained that she was worried and upset about what she had been asked, Fierro reprimanded for telling someone about the interview, informed her that Fierro would have to inform Van Thillo about the situation, and proceeded to type everything Vargas was saying on her laptop.  *Id.* ¶ 76.  When Vargas asked her to stop, Fierro reportedly informed Vargas that she might have to interview her brother as well. *Id.*

Plaintiffs allege that students were selected for interviews on the basis of their race, national origin, or perceived national origin; Felarca's ELD students, who are largely immigrant students, were disproportionately interviewed compared to her mainstem history students.  *Id.* ¶¶ 51, 56.  They further allege that, by conducting these interviews and asking these immigrant students prying questions about whether they had participated in immigrant-right protests and, in some cases, their family's immigration status, defendants sent a "hostile message to Plaintiffs that it disfavored and/or prohibited speech against racism in support of immigrant rights inside and outside the classroom."  *Id.* ¶ 129.

As discussed below, these factual allegations are sufficient to state § 1983 equal protection and First Amendment claims against defendants Van Thillo, Fierro, and Sacks.

### i.      Equal Protection Claim

To state an equal protection claim under § 1983, a plaintiff must allege facts sufficient to show that a defendant acted "with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."  *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).  This generally requires the plaintiff to show that he was treated differently than similarly situated

United States District Court
Northern District of California

1  individuals because of some protected classification.  Reviewing the allegations in the light most

2  favorable to plaintiffs, as I must at the motion to dismiss stage, I conclude that plaintiffs have

3  alleged sufficient facts to state an equal protection claim against Van Thillo, Fierro, and Sacks.

4       Plaintiffs allege a number of facts that suggest that defendants Van Thillo, Fierro, and

5  Sacks acted with a discriminatory purpose and selected plaintiffs for interviews on the basis of

6  their race or their actual or perceived national origin.  First, plaintiffs allege that all of Felarca's

7  current or former students were similarly situated, as all had Felarca as a teacher and could speak

8  to her classroom conduct and interactions with students.  Despite this, they allege that Van Thillo,

9  Fierro, and Sacks almost exclusively chose for interviews Felarca's ELD students, who were

10  overwhelmingly immigrants or non-native English speakers who could be perceived as

11  immigrants.[6]  If, as plaintiffs allege, all of Felarca's students were similarly situated, selectively

12  interviewing only the ELD students could suggest some discriminatory purpose.

13       Plaintiffs' allegations about the content of the interviews also suggest some potential

14  discriminatory purpose.  For example, plaintiffs allege that Sacks asked J.B., an immigrant student

15  who is not a native English speaker, whether Felarca discussed slavery and immigrant rights in

16  class, which left him confused and feeling as though the school district did not approve of such

17  issues being discussed.  They further contend that Van Thillo and Fierro asked Vargas and X.M. a

18  number of personal questions about their and their families' English abilities and immigration

19  status, questions that they perceived as threatening in the context.  While Van Thillo, Fierro, and

20  Sacks may have reasonable explanations for asking these questions or primarily interviewing the

21  ELD students, the only question at the pleading stage is whether plaintiffs have made out a prima

22  facie case of discrimination.  Taken as a whole, and in the light most favorable to plaintiffs, these

23  allegations are sufficient to demonstrate that plaintiffs were treated differently than their non-

24  immigrant peers and suggests that by conducting these selective interviews, Van Thillo, Fierro,

25  and Sacks acted "with an intent or purpose to discriminate against the plaintiff[s] based upon

26

27  [6] Plaintiffs allege that Sacks pulled approximately six of Felarca's ELD students from class to
   interview them and that Van Thillo and Fierro interviewed at least two of her former ELD
28  students.  They allege that only one, or a very small number, of non-ELD students were
   interviewed.

1   membership in a protected class."

2       The students have adequately stated a § 1983 equal protection claim against Van Thillo,

3   Fierro, and Sacks.

4                    **ii.**       **Freedom of Speech**

5       To state a First Amendment claim, a plaintiff must allege facts showing that "by his

6   actions the defendant deterred or chilled the plaintiff's political speech and such deterrence was a

7   substantial motivating factor in the defendant's conduct." *Mendocino Envt'l Center v. Mendocino*

8   *Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal citation and alterations omitted).  A plaintiff

9   need not show that his speech was actually inhibited or suppressed, but that "an official's acts

10  would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.*

11  (citing *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)).  In assessing a First

12  Amendment retaliation claim, what matters is "the government's reason for [retaliating]" –

13  retaliatory acts taken against an individual due to a "factual mistake" regarding the individual's

14  First Amendment activities may still be subject to challenge. *Heffernan v. City of Paterson, N.J.*,

15  136 S. Ct. 1412, 1418-19 (2016).  A threat of retaliatory action may be sufficient to bring a

16  retaliation claim.  "[T]he mere threat of harm can be an adverse action, regardless of whether it is

17  carried out because the threat itself can have a chilling effect." *Brodheim v. Cry*, 584 F.3d 1262,

18  1269-70 (9th Cir. 2009).

19      Reviewing the allegations in the light most favorable to plaintiffs, they have adequately

20  stated a First Amendment claim against Van Thillo, Fierro, and Sacks.  Plaintiffs state that the

21  defendants interviewed students in large part to determine whether they and Felarca had

22  participated in political speech by attending protests.  For example, Sacks asked J.B. to tell her

23  whether he had attended any protests with Felarca, when and where those protests were, and the

24  nature of the protests.  Van Thillo and Fierro interviewed Vargas and X.M. after they had spoken

25  out in support of Felarca at a public meeting.  They then asked the students whether they had

26  attended any protests with Felarca and to provide specific details about those events.  These

27  questions suggest that students were selected for interviews, at least in part, on the belief that they

28  had participated in some type of political speech.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The plaintiffs' allegations also indicate that the tone, overall context, and nature of these

2    interviews could chill a person of ordinary firmness.  The students allege that they were pulled out

3    of class and sent to meet with administrators or an attorney that they did not know and asked

4    detailed questions about their own, and Felarca's, protest activity.  After the first day of

5    interviews, Felarca was placed on administrative leave.  Given the content of these interviews,

6    largely focused on whether Felarca engaged in certain political speech in and out of the classroom,

7    and touching on the student's own political speech, Felarca's temporary leave could have given

8    the students the impression that she was being disciplined because the school disapproved of her

9    expressing certain political beliefs and that they could face similar consequences.  Further,

10   plaintiffs have alleged that Vargas and X.M. were interviewed shortly after voicing their support

11   for Felarca at a public Board meeting and were then asked sensitive and concerning questions

12   about their and their families' immigration status.  The timing of these interviews and the prying

13   nature of these questions could lead them to believe that they were in trouble and at risk of some

14   kind of retaliation for supporting Felarca.

15   The secretive and serious nature in which the interviews were conducted could also lead

16   the students to believe they were in some kind of trouble or that the school disapproved of them

17   participating in protests.  For example, the students report they were told not to tell others about

18   the interviews.  When Vargas told a teacher anyway, she was chastised by Fierro.  The pair then

19   had a tense conversation where Fierro typed everything Vargas said, told Vargas she would have

20   to report the incident to Van Thillo, and informed Vargas that Fierro might need to interview her

21   brother as well.  The students were also allegedly not told the purpose of the interviews or offered

22   any assurances that they were not in trouble and had not done anything wrong.  Instead, they were

23   left to speculate and worry that they were themselves in trouble for participating in protests.

24   Given these allegations, and that the student plaintiffs are largely middle school and young high

25   school students, they have alleged sufficient facts to sustain a claim that Sacks, Van Thillo, and

26   Fierro acted with the intent to chill or deter the students' speech and took steps that would chill a

27   person of ordinary firmness.

28

25

United States District Court
Northern District of California

2.      **Count Two: Racial & National Origin Discrimination, Hostile Educational Environment, & Retaliation under Title VI of the Civil Rights Act**

Plaintiffs bring claims for racial discrimination under Title VI of the Civil Rights Act against BUSD.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.  Although plaintiffs' complaint is not wholly clear, they appear to bring three independent claims under Title VI: one for general discrimination; one for retaliation; and one for hostile educational environment.  These claims are brought only against BUSD, which is not immune under the Eleventh Amendment for a Title VI violation.

Plaintiffs have failed to state a retaliation claim or a hostile environment claim under Title VI.  However, they have adequately alleged that they were discriminated against by school officials on the basis of their race or national origin.

### a.      Discrimination

To state a prima facie claim of discrimination under Title VI a plaintiff must allege facts sufficient to "give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Generally, this requires plaintiffs to plead facts demonstrating that (1) they are part of a protected class, (2) they were treated differently from similarly situated individuals, and (3) this treatment was motivated by their protected status. *See Rashan v. Geissberger*, 764 F.3d 1179, 1182 (9th Cir. 2014); *see also TC v. Valley Cent. School Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) ("[A] claim of discrimination under Title VI must plead (1) that defendants discriminated against them on the basis of race, (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for defendants' actions.").

Plaintiffs have alleged that Felarca's ELD students are members of a protected class because they are primarily immigrant students.  They have alleged that the ELD students were treated differently from Felarca's primarily native born mainstem students because the school only (or almost exclusively) interviewed the ELD students.  They have additionally alleged

circumstantial evidence of discriminatory intent: they were pulled out of class and asked invasive questions about whether they had attended immigrant-rights protests, whether Felarca discussed issues of immigrant rights in class, and what their and their families' immigration status was. Taken in the light most favorable to plaintiffs, these allegations could give rise to the inference that the school officials selected the ELD students for interviews and pulled them out of class because of their immigrant status or perceived immigrant status and subjected them to personal, confusing, and possibly threatening questions for a discriminatory purpose.

BUSD asserts that plaintiffs have not adequately pleaded a Title VI claim because they have not pleaded any formal adverse school-related action.  BUSD Oppo. at 7.  While an adverse school related action is a necessary component of a school-based retaliation claim brought under Title VI, it is not a clear component of a direct intentional discrimination claim. *Compare Papelino v. Albany Coll. of Pharm. Of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (to plead a retaliation claim under Title VI a plaintiff must allege "an adverse school-related action"), *with*, *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001) (a plaintiff may establish an intentional discrimination claim under Title VI by pleading (1) that the defendant discriminated against them on the basis of race; (2) the discrimination was intentional; and (3) it was a motivating factor for the defendant's actions).  The cases that BUSD cites, all discussing retaliation claims under Title VI or analogous civil rights statutes, do not convincingly support BUSD's argument that non-retaliation claims brought under Title VI must also allege an "adverse school-related action."

Further, the limited case law discussing intentional discrimination claims under Title VI indicates that students need not allege a formal, adverse school action to maintain such a claim. For example, in *TC*, the Southern District of New York concluded that a white student had adequately stated a discrimination claim under Title VI where he alleged that, in response to a conflict he had with minority students, his school treated him differently than the minority students by pulling him out of class, accusing him of using racial epithets without mentioning that minority students had used racial epithets against him, and suggesting that he not attend a school football game. *TC*, 777 F. Supp. 2d at 595.  Even though the student did not face any formal school-related action in conjunction with this episode, the court concluded that the statements

1    from school administrators as well as the "different reactions to white and minority participants in

2    the incidents" was sufficient to maintain a claim of discrimination.  *Id.*

3        Plaintiffs have alleged that, similar to the student in *TC*, they were treated differently than

4    their non-immigrant peers by school administrators.  The plaintiffs were pulled from class and

5    subjected to invasive interviews that touched on their personal, immigrant-related protest activities

6    and, in some cases, on delicate personal issues, such as their and their families' immigration

7    status.  They have alleged that Felarca's non-immigrant students were spared this treatment and

8    were allowed to stay in class, free from invasive and confusing personal questions.  They have

9    adequately alleged a prima facie case of discrimination under Title VI.

                    **b.    Hostile Educational Environment**

11       The Ninth Circuit has held that to sustain a Title VI claim for a hostile school environment

12   a plaintiff must allege (1) that there is a racially hostile environment; (2) that the district had notice

13   of the problem; and (3) that it failed to respond adequately to redress the problem.  *Moneiro v.*

14   *Tempe Union High School Dist.*, 158 F.3d 1022, 1033 (1998).  A racially hostile environment is

15   one that is "so severe, pervasive, and objectively offensive, and that so detracts from the victims'

16   educational experience, that the victims are effectively denied equal access to an institution's

17   resources and opportunities."  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999)

18   (discussing the standard for harassment claims under the analogous Title IX framework).

19       Plaintiffs' allegations are limited to interviews conducted with students in the context of an

20   investigation into Felarca's potential misconduct.  Although plaintiffs have adequately alleged that

21   they were treated differently from their non-immigrant peers, and that this treatment may have had

22   some discriminatory motivation, they have not alleged sufficient facts to demonstrate that this

23   discrimination was "severe, pervasive, or persistent" in a way that interfered with the students'

24   ability to participate in school.  Conduct that is more pervasive, and more overtly racist or

25   discriminatory has been found insufficient to create a hostile environment under analogous Title

26   VII cases.  *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 643 (2003)(a supervisor's two

27   offensive statements  regarding "Hispanics" and two memos criticizing a Latino employee's

28   performance were not sufficient to create a hostile work environment); *Sanchez v. City of Santa*

United States District Court
Northern District of California

*Ana*, 936 F. 2d 1027, 1031, 1037 (9th Cir. 1990)(allegations that employer posted racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided Latinos with unsafe vehicles, did not provide adequate police backup for Latino officers, and kept illegal files on Latino plaintiffs was not sufficient to sustain hostile work environment claim); *Kortan v. California Youth Authority*, 217 F.3d 1104, 1111 (9th Cir. 2000)(although supervisor's language was offensive, there was no hostile environment where supervisor called female employees "castrating bitches," "Madonnas," and "Regina" and occasionally sent personal letters to the plaintiff at home).

Each of the plaintiffs in this case was subjected to (or pulled out of class for) a single, allegedly discriminatory interview touching on sensitive and personal topics regarding immigrant rights. Although the plaintiffs allege that these interviews were prying and made them uncomfortable or concerned, they have not alleged that they were subjected to any overtly racist statements or conduct, or that the discriminatory conduct extended beyond the allegedly inappropriate, one-off interviews. This conduct is distinctly less severe and less persistent than the conduct found insufficient to create a hostile environment in *Vasquez*, *Sanchez*, or *Kortan*. Given these precedents, plaintiffs have failed to allege sufficient facts to support a hostile educational environment claim.

### c.     Retaliation Claim

Title VI prohibits retaliation against any individual "because he has made a complaint, testified, assisted, or participated in any manner in an investigation" regarding discrimination in a federally funded program. 34 C.F.R. § 100.7(e). To make out a prima facie claim for retaliation a plaintiff must demonstrate: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Papelino*, 633 F.3d at 91 (discussing retaliation claims in the analogous Title XI context). Without alleging that they engaged in some "protected activity," such as complaining about racial discrimination, plaintiffs cannot make out a claim of retaliation. *Cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005)("To prevail on the merits, Jackson will have to prove that the Board retaliated against him *because* he complained of

United States District Court
Northern District of California

sex discrimination.").

Plaintiffs have failed to state a claim of retaliation under Title VI because they have not alleged that they engaged in any protected activity.  In their complaint, plaintiffs allege that they were selected for interviews "in retaliation for [Felarca's] anti-racist protests during off-duty hours."  Compl. ¶ 119.  This is insufficient to sustain a retaliation claim because (1) Felarca's off-duty protests were not "protected activity" under Title VI and (2) because plaintiffs cannot be retaliated against for someone else's conduct.  The students have failed to state a retaliation claim.

### 3.    Claims Four—Six

Plaintiffs' bring state law claims for (1) violations of the parents' right to participate in the education of their children in violation of California Education Code 51101(a) and (b); (2) violation of the Bane Act, Cal. Civ. C. § 52.1; and (3) intentional infliction of emotional distress.  As discussed above, all the defendants are immune from suit on these state law claims under either the California Tort Claims Act or the litigation privilege.  These claims are dismissed.

### 4.    The Parent Plaintiffs' Claims

Although plaintiffs' factual allegations virtually ignore the parents, all claims are brought on behalf of the parent plaintiffs in addition to the students.  Given that the defendants are immune from suit on the sate law claims, and the scant factual allegations relevant to the parent plaintiffs, the parent plaintiffs have failed to state any claim.

The parent plaintiffs' claims of racial discrimination under § 1983 and Title VI fail because there are virtually no factual allegations related to discrimination against the parents – rather the parents' claims seem to rely on the alleged discriminatory conduct toward their children.  *Allen v. Wright*, 468 U.S. 737, 755 (1984) (injury caused by racial discrimination "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct") (internal quotations and citation omitted).  The parents' discrimination claims, brought under § 1983 and Title VI, are dismissed.

The parent plaintiffs have also failed to allege facts to sustain a claim for a First Amendment violation.  There are no allegations to suggest that the defendants took any action in an attempt to deter the students' parents' political speech.  The only allegations related to any

parent's speech are related to Leviton. Plaintiffs allege that Leviton spoke at a public Board meeting and that the school called him at some later date and "told him that any political protests that B.L. participated in were not sanctioned by the District." Compl. ¶ 54. There is no indication that Leviton received this call because he spoke at the Board meeting or that the phone call was directed at his speech in any way, as opposed to B.L.'s. It is also significant that, as a parent, rather than a student, Leviton does not face any potential direct consequence or punishment from the school as a result of engaging in any political speech. Given that the district's phone call did not address, or even acknowledge, that Leviton had participated in or might participate in any political speech, and that Leviton did not face any direct disciplinary action from the school, a person of ordinary firmness in his position would not find such a call chilling to his own political speech. There are no allegations regarding any other parent's political speech, let alone allegations indicating that the defendants engaged in any conduct that might violate the parents' First Amendment rights. The parent plaintiffs cannot sustain this claim.

The parents have failed to state any claim. All claims brought by the parent plaintiffs are DISMISSED.

## CONCLUSION

Defendants' motions to strike are GRANTED with regard to all of the plaintiffs' state law claims (Count One and Count Three to the extent they are asserted under the California Constitution, and Counts Four, Five, and Six). These claims are STRICKEN.

Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART as follows:

GRANTED with regard to all of plaintiffs' state law claims (Count One and Count Three to the extent they are asserted under the California Constitution, and Counts Four, Five, and Six);

GRANTED with regard to all claims brought by the parent plaintiffs;

GRANTED with regard to the § 1983 claims (Count One and Count Three) brought against BUSD, Alper, Appel, Daniels, Hemphill, Leyva-Cutler, Evans, Pasarow, Levenson, and Tamondong-Bradley;

DENIED with regard to the § 1983 claims (Count One and Count Three) brought against Van Thillo, Fierro, and Sacks;

1    GRANTED with regard to the Title VI retaliation and hostile educational environment claims

2  (Count Two); and

3    DENIED with regard to the Title VI intentional discrimination claim (Count Two).

4    Plaintiffs' § 1983 claims against BUSD are DISMISSED WITH PREJUDICE.  Plaintiffs  have

5  leave to amend all other claims within twenty days of the date below.

6    **IT IS SO ORDERED.**

7  Dated: August 10, 2017

8

9  _____

10  William H. Orrick
   United States District Judge

11